

DA 10-0435

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2011 MT 112

DAVID W. and JOANN A. GIBSON, and the
PRAIRIE DRIVE SUBDIVISON HOME OWNER'S
ASSOCIATION, a Montana corporation,

        Plaintiffs and Appellants,

   v.

PARAMOUNT HOMES, LLC, a MONTANA LLC,
UNITED STATES SEAMLESS OF SW MONTANA,
Inc., a Montana corporation,

        Defendants, Appellees and Cross-Appellants.

| | |
|---|---|
| APPEAL FROM: | District Court of the Sixth Judicial District,<br>In and For the County of Park, Cause No. DV 06-69<br>Honorable Wm. Nels Swandal, Presiding Judge |

COUNSEL OF RECORD:

        For Appellants:

            J. Troy Redmon; Redmon Law Firm, P.C., Bozeman, Montana

        For Appellees:

            Karl Knuchel, Attorney at Law, Livingston, Montana

               Submitted on Briefs:  May 13, 2011

                       Decided:  May 24, 2011

Filed:

                              _____
                                   Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 David and Joann Gibson and the Prairie Drive Subdivision Home Owner's Association (collectively referred to as Gibsons) sued Paramount Homes and U. S. Seamless (collectively referred to as the Developers) to enforce their easement over Prairie Drive in Park County, Montana, near the City of Livingston. Gibsons appeal from the District Court's Findings of Fact, Conclusions of Law and Order dated August 4, 2010.

## BACKGROUND

¶2 The property now owned by Gibsons and Developers was at one time owned by Petersons, who subdivided it and sold larger multi-acre lots. In 1993 and 1994, Petersons recorded certificates of survey depicting an express 60-foot wide easement for ingress and egress to their subdivision over a road called Prairie Drive. In July, 1994, Petersons and other adjacent land owners who used Prairie Drive entered an "Agreement for Maintenance of Roads and Establishment of Home Owner's Association." This established and recognized their rights to use Prairie Drive as a private easement, and that future purchasers of tracts in Petersons' subdivision would have the same rights. The agreement provided that all future purchasers of Peterson lots became members of the Home Owner's Association with easement rights to Prairie Drive. In 1995 Park County, as part of its approval of the subdivision, required Petersons to dedicate Prairie Drive to the public for access.

2

¶3     The Developers purchased one of the tracts of the Peterson subdivision, to have it annexed by the City of Livingston with the intent to further subdivide it into smaller lots. In a May, 2000, letter the developers stated that their project contemplated 58 single-family lots and 19 multi-family lots on 29 acres. Since Gibsons' property and the Developers' property were parts of the original Peterson subdivision, they are all members in the Home Owner's Association. They are thereby parties to the maintenance agreement originally executed in 1994. Prairie Drive and Gibsons' easement crossed the Developers' land and Developers acquired the land subject to the easement and to membership in the Home Owner's Association. Gibsons operate a large ranch and, along with other property owners in the largely rural area, used the easement over Prairie Road for a number of years to move vehicles, trailers, and heavy equipment in and out of the area.

¶4     After annexation of their land into the City of Livingston, the Developers successfully completed the process to subdivide their property into small lots with paved streets bordered by curbs and gutters. The City Commission approved the preliminary plat for the Ridgeview Subdivision on August 15, 2005. The staff report recommending approval noted that the subdivision will extend the City's street network to serve the project and that each lot would be added to the City's street maintenance district and be assessed in the same manner as other lots in the City. The Developers recorded the final subdivision plat on May 6, 2006, which provided the location of specific streets and lots. Even though parts of it are relocated, Prairie Drive continues to exist after construction of the Developers' subdivision, but it is now paved, narrower, and bordered by curbs and

3

gutters. The Developers also replaced a previous gradual sweeping "S" curve in Prairie Drive with two essentially right-angle corners. *See* illustration below showing Prairie Drive as relocated by the Developers, depicted with diagonal shading, and the original location depicted with dashed-line borders.



¶5 Gibsons sued both the City of Livingston and the Developers seeking recognition and enforcement of their easement. The case was tried to the District Court without a jury in February, 2010.[1] The District Court entered its Findings of Fact, Conclusions of

---

[1] Gibsons originally sued the City but settled during the litigation for a modest amount of cash and the City's agreement to "paint curbs" and place no-parking signs along the new Prairie Road in the subdivision.

4

Law and Order in August 2010. Referring to the reconfiguration of the two gradual curves, the District Court found that the Developers' reconstruction of Prairie Drive for the subdivision created a "permanent obstruction" to Gibsons' easement in two locations, "effectively obliterating the easement and making passage by vehicle impossible."

¶6 The District Court found that the new street alignment decreased the quality of Gibsons' access; has created safety and access quality issues; and was not an adequate replacement for Gibsons' easement based upon their prior use and the applicable engineering standards. The District Court found that longer and larger vehicles that could easily negotiate the former "S" curve on Prairie Drive could not easily negotiate the two new right-angle turns required to get through the subdivision.

¶7 The District Court held that Gibsons' easement existed independently of any public right to use the Prairie Drive right of way, but concluded that while the Developers had obstructed and obliterated Gibsons' easement, the new road through the subdivision "is superior in construction to the historic Prairie Drive." Consequently, the District Court ordered that the Developers bear the cost of a new certificate of survey showing Gibsons' platted easement to be in the location of the new road through the subdivision, and permanently enjoined the Developers from any further obstruction of the easement. The District Court also ordered the Developers to re-build the two new right-angle turns to "increase the radii of the road so that all vehicles, including those oversized vehicles utilized for recreation and business of the [Gibsons] may proceed without having to go off the roadway or cross lanes."

5

¶8 In explanatory comments the District Court stated that the interference with Gibsons' easement "can be remedied by widening or eliminating the curbs and other obstructions" in the new road. The District Court determined that further relief was stymied by the fact that the road is now the property of the City of Livingston and any alterations in the road require the City's prior approval. Since the City had been dismissed as a party, the District Court concluded that it had no authority to order the City to re-locate the streets in the annexed subdivision. Last, the District Court ordered that each party bear its own costs and attorney fees.

¶9 Gibsons agree with the District Court's findings of fact and conclusions of law, but contend that the District Court erred in refusing to restore their "historical" easement rights in Prairie Drive and in failing to award them attorney fees and costs as the prevailing party in the litigation. Developers cross-appeal contending that the District Court erred in not dismissing the Home Owner's Association for lack of standing; that the 1995 dedication of Prairie Drive as a public road extinguished any grant of easement to Gibsons; that the annexation of their subdivision and dedication of Prairie Drive as a city street extinguished the easement; that Gibsons' settlement with the City extinguished all their claims; and that they, the Developers, prevailed and are entitled to attorney fees.

## STANDARD OF REVIEW

¶10 This Court reviews a district court's conclusions of law to determine whether they are correct, while findings of fact will be upheld unless they are clearly erroneous. *Omimex Can., Ltd. v. State of Montana*, 2008 MT 403, ¶ 16, 347 Mont. 176, 201 P.3d 3. A decision on a request for an award of attorney fees is reviewed for abuse of discretion

6

unless a contract requires an award of fees, in which case a district court lacks discretion to deny the request. *Emmerson v. Walker*, 2010 MT 167, ¶ 20, 357 Mont. 166, 236 P.3d 598; *In re Szafryk*, 2010 MT 90, ¶ 19, 356 Mont. 141, 232 P.3d 361. In that case we review the district court's construction and interpretation of the contract to determine whether it is correct. *Szafryk*, ¶ 19.

## DISCUSSION

¶11   *Issue One:  Whether the District Court erred in refusing to enforce Gibsons' historical easement rights.*

¶12   The District Court found that Gibsons had a valid easement over Prairie Drive that could not be moved and otherwise altered as the Developers did without Gibsons' consent.  Gibsons argue that since the easement was altered and obstructed by the Developers' subdivision, it was error for the District Court to conclude that the new road was "superior in construction" to the old one and to allow the two new turns to remain in the new location.  They contend that it was error to not require that the new Prairie Drive be re-built to the same width and alignment of the former Prairie Drive.

¶13   Gibsons correctly note that the owner of the servient estate (here, the Developers) may not ordinarily change the location of a right of way without the consent of the easement holder (here the Gibsons).  This is the law in Montana. *Parker v. Elder*, 233 Mont. 75, 80, 758 P.2d 292, 295 (1988).  Nevertheless, the rights of the servient landowner to reasonably use the land must be considered along with the right of the easement holder to reasonably use the easement.  *Tungsten Holdings, Inc. v. Kimberlin*, 2000 MT 24, ¶ 40, 298 Mont. 176, 994 P.2d 1114 (servient landowner

failed to establish that a gate across an easement was reasonably necessary for the enjoyment of the land).

¶14    One of Gibsons' primary concerns about routing their easement through the subdivision was that the corners were aligned and restricted so that the larger vehicles and towed equipment they often used could not safely make required turns.  Gibsons presented evidence at trial concerning the width and radii of turns that would be required to accommodate their uses. In response, the District Court ordered the Developers to "increase the radii of the road so that all vehicles, including those oversized vehicles utilized for recreation and business by the Plaintiffs may proceed without having to go off of the roadway or cross lanes."  This was responsive to Gibsons' objection to the new alignment, and implemented technical evidence on roadway geometry that Gibsons presented at trial.

¶15    We adhere to and adopt the rule quoted above from *Parker*, that a servient landowner may not ordinarily change the location of an easement without the consent of the easement owner.  In a case like the present one, when a district court is presented with evidence that a servient owner has relocated and interfered with an easement, the issue is what relief should be fashioned to restore the rights of the easement owner.  On its face, the relief ordered by the District Court in this case expressly requires that Prairie Drive be altered to accommodate the use that Gibsons had historically made of it by easing the angle of the corners.  We construe the District Court's order to require that the Developers restore the curves on Prairie Drive to accommodate the reasonable uses made by Gibsons prior to the alterations made by the Developers.  This is a reasonable

accommodation of the desire of the Developers to provide a paved road through the subdivision and Gibsons' rights to continue to use their historic easement. If the Developers comply with the relief ordered by the District Court, Gibsons should be able to move their vehicles and equipment in and out of their property, using the Prairie Drive easement, as they did prior to the development of the subdivision.

¶16     Gibsons have failed to demonstrate that the relief ordered by the District Court, if properly implemented, will not allow them to use their easement essentially as they did prior to construction of the Developers' subdivision.  Therefore, the District Court both recognized and upheld Gibsons' easement rights and ordered relief specifically designed to address their complaints.  The re-configuration of the road, in addition to the District Court's confirmation of Gibsons' easement, the requirement that it be re-surveyed and recorded by the Developers, and a permanent injunction against future interference adequately recognized and protected Gibsons' interests.  We find no error.

¶17     *Issue Two:  Whether the District Court erred in ordering that each party bear its own attorney fees and costs*.

¶18     Gibsons and the Developers each contend that they are entitled to an award of attorney fees and costs.  Any entitlement to an award of fees arises from paragraph 6 of the Home Owner's Agreement, which provides that it may be enforced by an action for damages or for an injunction, "and the prevailing party shall be entitled to his costs and reasonable attorney's fees."  The District Court did not apply this provision, but held that each party should bear its own fees and costs.

9

¶19 Since both sides claim the right to fees under this provision, there is no dispute that it applies. A determination of the prevailing party requires consideration of all the facts and circumstances of a case. *Doig v. Cascaddan*, 282 Mont. 105, 113, 935 P.2d 268, 272-73 (1997). Gibsons brought this action to enforce their easement rights under the Agreement, and clearly under the circumstances they were the prevailing party. This is not a case in which there was no prevailing party so as to negate entitlement to fees. *See Whipps v. Kaufman, Vidal, Hileman & Ramlow*, 2007 MT 66, ¶ 9, 336 Mont. 386, 156 P.3d 11. The District Court found Gibsons' easement valid and enforceable in the face of the Developers' contentions that it had been extinguished; found that the Developers had interfered with the easement; ordered specific physical alterations to the road to accommodate the easement; ordered the Developers to re-survey and record the easement; and entered permanent injunctive relief in favor of Gibsons.

¶20 There is no factual support for the Developers' argument that they were actually the prevailing party. While Gibsons did not obtain the full extent of the relief they wanted, they prevailed on all substantive issues. Therefore, Gibsons are entitled to attorney fees and costs, and this issue will be remanded to the District Court for a determination of Gibsons' costs and reasonable attorney fees.

¶21 When entitlement to costs and attorney fees arises from contract, that entitlement includes costs and attorney fees on appeal. *In the Matter of the Estate of Burrell*, 2010 MT 280, ¶ 41, 358 Mont. 460, 245 P.3d 1106; *Boyne USA, Inc. v. Lone Moose Meadows, LLC*, 2010 MT 133, ¶ 26, 356 Mont. 408, 235 P.3d 1269. Again, considering all the circumstances of the appeal, Gibsons are the prevailing parties. They prevailed on

10

the attorney fee issue and they prevailed against the Developers' arguments on appeal and cross-appeal that the easement was invalid and unenforceable. If Gibsons had not prevailed on the fundamental issue of the validity of the easement they would have lost the entire case. Therefore, they are also entitled to costs and attorney fees on appeal.

¶22 *Issue Three: The Developers argue that the District Court erred by not dismissing the Home Owner's Association as a party for lack of standing.*

¶23 At the time of the trial in this case the Association had been involuntarily dissolved as a corporation by the Secretary of State for failure to file its annual report. The Association subsequently cured the defect and its standing as a corporation was reinstated. The District Court held that under Montana law the reinstatement of the Association as a corporation related back to the date it was involuntarily dissolved. A reinstated corporation is "considered to have been an existing legal entity from the date of its original incorporation." Section 35-6-202, MCA; *Valley Victory Church v. Sandon*, 2005 MT 72, ¶ 17, 326 Mont. 340, 109 P.3d 273. The District Court's conclusions on this issue are correct and the Association had standing to participate in this case.

¶24 *Issue Four: Whether the Petersons' dedication of Prairie Drive as a public road extinguished any easement claim by Gibsons.*

¶25 The Developers argue that when Petersons dedicated Prairie Drive for public access as part of the Park County subdivision approval process, they did not reserve any rights to grant further easements and that "any further grants" were "meaningless."

¶26 The easement rights in Prairie Drive that are now at issue were memorialized in July, 1994 when Peterson and other area landowners entered the "Agreement for

11

Maintenance of Roads and Establishment of Home Owner's Association." Peterson and the other parties to that agreement held easements over Prairie Drive from the date the agreement was executed. The following year Petersons, to meet conditions for approval of their subdivision, dedicated Prairie Drive "to Park County, Montana, to be used as a public road. . . . " Clearly the dedication to public use occurred after the establishment of the easement rights held by Peterson and the other signatories to the Agreement. Assuming that Peterson's dedication of Prairie Drive as a public road was consistent with the terms of the prior Agreement, nothing in the dedication provided that the public right was exclusive or expressly provided for the extinguishment of any of the prior easement rights.

¶27 Moreover, this Court long ago adopted the rule that private and public easement rights in the same road can coexist and that alteration of the public right does not affect the private easement. *McPherson v. Monegan*, 120 Mont. 454, 460-61, 187 P.2d 542, 545 (1947). *See also Tungsten Holdings, Inc. v. Kimberlin*, 2000 MT 24, ¶ 21, 298 Mont. 176, 994 P.2d 1114. There is no evidence that Gibsons' private property right in the easement has been taken or extinguished. The District Court correctly concluded that Gibsons' private easements exist independently of any public right to use the right of way.

¶28 *Issue Five: Whether the annexation and subdivision review process for the Developers' subdivision extinguished or altered Gibsons' easement rights.*

12

¶29 The Developers argue that because Gibsons did not challenge the annexation of the subdivision into the City of Livingston, they are precluded from complaining about the design and layout of the streets in the subdivision, including Prairie Drive.

¶30 In this case, the relevant City of Livingston subdivision documents, including the plat, acknowledge the existence of Gibsons' easement rights over Prairie Drive. The City, therefore, clearly annexed this area subject to and with recognition of Gibsons' prior easements. Further, in May, 2006, the Livingston City Attorney wrote the Developers a letter specifically acknowledging Gibsons' easement rights, and warning that those rights were not extinguished by "the mere fact that you have provided alternative routes." The City Attorney concluded that "it is the City's position that approval of your preliminary plat has no legal effect upon the pre-existing easements. These 60 foot pre-existing easements still appear to exist as a matter of law."

¶31 Gibsons are not challenging the annexation or the nature of Prairie Drive as a city street. The Developers have cited nothing in the annexation or subdivision process or in the law that extinguished Gibsons' easement rights. Clearly, the City of Livingston recognized the continuing validity of those rights and specifically warned the Developers that the rights had to be acknowledged and accounted for. Gibsons were not required to do any more in this regard to protect their interests.

¶32 *Issue Six: Whether Gibsons' settlement with the City of Livingston absolves the Developers of any liability*.

¶33 Gibsons originally sued the City of Livingston on a claim that the City's street standards had caused the inverse condemnation of their easement. The complaint

13

contained separate claims on other grounds against the Developers. Gibsons and the City subsequently reached a settlement that was reduced to writing in April, 2008. That agreement specifically settled Gibsons' claims against the City only, as reflected in the District Court's subsequent order dismissing Gibsons' claims against the City. There is nothing in the settlement agreement or in the court's order that can be construed as also disposing of Gibsons' claims against the Developers.

¶34 There is no indication that the Developers ever raised this issue in the District Court proceedings and they make no cogent argument on appeal to support their position that the settlement "tangentially" released all claims against them. There is no merit in this argument.

¶35 The District Court is affirmed except as to the matter of Gibsons' entitlement to attorney fees and costs. This matter is remanded to the District Court for a determination of Gibsons' reasonable attorney fees and costs, including their fees and costs on appeal.

/S/ MIKE McGRATH

We concur:

/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS

Justice James C. Nelson, specially concurring.

¶36 I concur in the Court's decision. With respect to Issue One, however, my concurrence is with the following caveats.

¶37 The basic facts are as follows. Gibsons possess historical easement rights over land owned by the Developers. The District Court and this Court have recognized those easement rights. Also, the City of Livingston annexed the area in question subject to and with recognition of Gibsons' prior easements; in other words, the annexation did not extinguish or alter Gibsons' easement rights. Notably, the diagram attached to the Developers' May 24, 2005 Petition for Annexation depicts Gibsons' easement in its historical location across the land to be annexed, and the City's June 20, 2005 Resolution No. 3641 annexes the land "as depicted on S/D #253," which likewise shows Gibsons' easement in its historical location. Gibsons never consented to the relocation of all or a part of their easement by the Developers. Nevertheless, the Developers unilaterally relocated a portion of Gibsons' easement, in violation of Montana law.[1] And now the question, as stated by the Court, is "what relief should be fashioned to restore the rights of the easement owner." Opinion, ¶ 15.

---

[1] At trial, the Developers justified this action on the ground that "[annexation] by the City, in our mind, gave us the ability to move this street down here, if we needed to." This was not the view of the City, however, which sent a letter to the Developers dated May 8, 2006, stating: "[I]t is the City's position that approval of your preliminary plat has no legal effect upon the pre-existing easements." The City also observed that "[f]rom a brief review of the record, it does appear that when you purchased the property you should have been on notice that the property was subject to these easements. The mere fact that you have provided alternative routes does not extinguish these pre-existing easements."

¶38 Ideally, the District Court should have ordered that Prairie Drive be returned to its precise historical location. However, the court believed it was constrained from doing so due to the fact that Gibsons had settled with the City, and correspondingly dismissed their claims against the City, earlier in the litigation. The court thus reasoned in its Order that

> [t]he problem the Court face[s] is that this road now belongs to the City of Livingston and the remaining defendants *cannot* alter or improve Prairie Drive without obtaining approval and permits from the City. Since the City was dismissed from this suit, the Court has no authority to order the City to do anything about the streets in the annexed area at issue.

Given these circumstances, the District Court fashioned a remedy designed to best approximate the relief sought by Gibsons. It ordered the Developers to restore the curves in Prairie Drive to accommodate Gibsons' historical use of their easement.

¶39 On the specific facts presented here, I believe this remedy will sufficiently restore the easement. As reflected in the diagram following ¶ 4 of the Opinion, the Developers took a 550-foot stretch of Gibsons' easement (the arch running from Lot 66A, through Lots 65A and 65B, over to Lots 69A, 69B, and 70A) and replaced it with the 450-foot straight stretch running west-east across the diagram. In order to comply with the District Court's order, the Developers will have to reconfigure Lot 66A or Lot 77A (or both) on the west side, and Lot 69B (and perhaps other neighboring lots) on the east side, of the west-east stretch of Prairie Drive. The end result will be that the road is configured substantially the same as it was before—albeit, with the middle of the west-east stretch located roughly 150 feet south of where it had been.

¶40 However, while I conclude that this remedy is sufficient to restore Gibsons' easement, I categorically reject the "don't ask permission; ask forgiveness" approach

16

followed by the Developers in this case. And I do not believe that our decision should be read as countenancing the sort of flagrant violation of easement rights that occurred here.

¶41 As Gibsons point out in their brief, and as the Court reaffirms in ¶¶ 13 and 15 of the Opinion, the law in Montana is that neither the owner of the dominant estate, nor the owner of the servient estate, may ordinarily change the location of all or part of a right-of-way, without consent of the other. *Parker v. Elder*, 233 Mont. 75, 80, 758 P.2d 292, 295 (1988); *see also e.g. Anderson v. Stokes*, 2007 MT 166, ¶ 46, 338 Mont. 118, 163 P.3d 1273 (holding that the location of the easement was fixed to its historical location and could not be unilaterally relocated by the owner of the dominant estate). As a matter of fact, this no-unilateral-relocation rule is the majority rule in the United States. *See* Jon W. Bruce & James W. Ely, Jr., *The Law of Easements and Licenses in Land* § 7:13, 7-31 (Thomson Reuters 2011) ("As a general rule, once the location of an easement has been established, neither the servient estate owner nor the easement holder may unilaterally relocate the servitude." (citing numerous cases)); *Stamatis v. Johnson*, 224 P.2d 201, 202-03 (Ariz. 1950); *Herren v. Pettengill*, 538 S.E.2d 735, 736 (Ga. 2000); *Davis v. Bruk*, 411 A.2d 660, 664 (Me. 1980); *Everdell v. Carroll*, 336 A.2d 145, 155 (Md. Spec. App. 1975); *A. Perin Dev. Co., LLC v. Ty-Par Realty, Inc.*, 667 S.E.2d 324, 326-27 (N.C. App. 2008); *MacMeekin v. Low Income Hous. Inst., Inc.*, 45 P.3d 570, 575-76 (Wash. App. Div. 1 2002); *Thompson on Real Property* vol. 7, § 60.04(c)(1)(ii), 538 (2d Thomas ed., Matthew Bender 2006).

¶42 One reason for prohibiting unilateral relocation is that treating the location of the easement as variable "would introduce considerable uncertainty into land ownership and

incite litigation." *R.C.R., Inc. v. Rainbow Canyon, Inc.*, 978 P.2d 581, 588 (Wyo. 1999) (citing *Stamatis*, 224 P.2d at 203); *accord Crisp v. VanLaeken*, 122 P.3d 926, ¶ 14 (Wash. App. Div. 2 2005) ("Judicial relocation of established easements . . . would introduce uncertainty in real estate transactions."). Moreover, "the easement holder could be subject to harassment by the servient owner's attempts to relocate to serve his own conveniences." *R.C.R., Inc.*, 978 P.2d at 588 (citing *Davis*, 411 A.2d at 665); *accord* Bruce & Ely, *The Law of Easements and Licenses in Land* § 7:13, 7-32 ("The no-unilateral-relocation general rule also protects the easement holder from such developments as capricious adjustments of the easement route by the servient estate owner."). "[T]he traditional approach—which effectively requires servient landowners to purchase, or obtain by consent, the right to relocate a legally established right-of-way—'favors uniformity, stability, predictability and property rights.' " *Sweezey v. Neel*, 2006 VT 38, ¶ 24, 904 A.2d 1050 (quoting *MacMeekin*, 45 P.3d at 579).

¶43 A handful of courts have fashioned an exception to the no-unilateral-relocation rule, permitting the owner of the servient estate to relocate the easement if the original termini are retained and the easement holder is not materially inconvenienced. *See* Bruce & Ely, *The Law of Easements and Licenses in Land* § 7:16, 7-37 to 7-38. However, as the Supreme Judicial Court of Maine pointed out, such an exception

> would definitely introduce considerable uncertainty into land ownership, as well as upon the real estate market, and serve to proliferate litigation which the general rule as prevails in Maine has tended to prevent. Indeed, the owner of the dominant estate would be deprived of the present security of his property rights in the servient estate and could be subjected to harassment by the servient owner's attempts at relocation to serve his own conveniences. A unilateral relocation rule could confer an economic

windfall on the servient owner, who presumably purchased the land at a price which reflected the restraints existing on the property. Such a rule would relieve him of such restraints to the detriment of the owner of the dominant estate whose settled expectations would be derailed with impunity.

*Davis*, 411 A.2d at 665.

¶44 Similarly, the Supreme Court of Georgia observed that

[a]llowing unilateral avoidance of the contract by the owner of the servient estate not only would violate fairness principles, it also would create uncertainty in real property law by opening the door for increased litigation over "reasonableness" issues based on today's conditions rather than those considered in the original bargain. No doubt, when the servitude was first created both parties considered all market factors, including their respective costs and benefits, before agreeing on the consideration for the transaction. If the benefits of relocation become substantial enough, it is the market that should ultimately bring the parties together again, not the courts.

*Herren*, 538 S.E.2d at 736. Hence, few courts recognize such a standard exception to the no-unilateral-relocation general rule. Bruce & Ely, *The Law of Easements and Licenses in Land* § 7:16, 7-39. And no such exception exists under Montana law.

¶45 Of course, absent an express provision to the contrary in the grant or reservation of the easement, the servient landowner may utilize the established easement area "in any manner and for any purpose that does not unreasonably interfere with the rights of the easement holder." Bruce & Ely, *The Law of Easements and Licenses in Land* § 8:20, 8-61 to 8-63; *see also Sampson v. Grooms*, 230 Mont. 190, 196-97, 748 P.2d 960, 964 (1988). The servient landowner may even impede the easement with a gate if doing so "is necessary for the reasonable use of the servient estate," "does not interfere with reasonable use of the right-of-way," and "is not expressly prohibited by the grant [or reservation] of an easement or impliedly prohibited by the surrounding circumstances."

19

*Gabriel v. Wood*, 261 Mont. 170, 177, 862 P.2d 42, 46 (1993). But the right to make reasonable use of the servient estate does not include the right to unilaterally relocate the easement, as the authorities cited above establish. *See also* Bruce & Ely, *The Law of Easements and Licenses in Land* § 7:13, 7-31, § 7:17, 7-46 to 7-48.

¶46 Again, unilateral relocations are disallowed for the following reasons:

1. treating the location of the easement as variable would introduce considerable uncertainty into land ownership, as well as upon the real estate market, and serve to proliferate litigation;

2. the easement holder would be deprived of the present security of her property rights in the servient estate, her settled expectations could be derailed with impunity, and she could be subjected to harassment by the servient owner's attempts at relocation to serve his own present conveniences;

3. the traditional approach—which effectively requires servient landowners to purchase, or obtain by consent, the right to relocate a legally established right-of-way—favors uniformity, stability, predictability, and property rights;

4. a rule allowing unilateral relocations could confer an economic windfall on the servient owner, who presumably purchased the land at a price which reflected the restraints existing on the property; and

5. allowing unilateral avoidance of the contract by the owner of the servient estate would open the door for increased litigation over "reasonableness" issues based on today's conditions rather than those considered in the original bargain.

As the Georgia Supreme Court pointed out, "when the servitude was first created both parties considered all market factors, including their respective costs and benefits, before agreeing on the consideration for the transaction. If the benefits of relocation become substantial enough, it is the market that should ultimately bring the parties together again, not the courts." *Herren*, 538 S.E.2d at 736.

20

¶47 Notably, we already have a rule that "prescriptive easements cannot be relocated by verbal or tacit consent." *Leisz v. Avista Corp.*, 2007 MT 347, ¶ 16, 340 Mont. 294, 174 P.3d 481 (citing *Glenn v. Grosfield*, 274 Mont. 192, 196, 906 P.2d 201, 204 (1995)). Rather, the parties must mutually agree *in writing* to relocate the easement. *See Glenn*, 274 Mont. at 195-96, 906 P.2d at 203-04. The same rule should apply with even greater force to an easement created in writing, as in the present case.

¶48 Harassment of dominant landowners and breaches of contract through unilateral relocations of easements by servient landowners are contrary to established Montana law under *Parker* and cannot be tolerated. However, because the remedy ordered by the District Court here will result in Prairie Drive's being configured substantially the same as it was before, I agree with the Court's decision to affirm the District Court under Issue One.

¶49 With the foregoing caveats, I specially concur.

/S/ JAMES C. NELSON

Justices Jim Rice and Michael E Wheat join in the Special Concurrence of Justice James C. Nelson.

/S/ MICHAEL E WHEAT
/S/ JIM RICE

21